159 N.J. Super. 533 (1978)
388 A.2d 984
RICHARD S. DARE, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY, ON BEHALF OF THE DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF NEW JERSEY RACING COMMISSION; THOMAS F. CONNERY, CHAIRMAN OF NEW JERSEY RACING COMMISSION; W. STEELMAN MATHIS, W. DANIEL WILLIAMS AND THOMAS J. SWALES, JR., MEMBERS OF NEW JERSEY RACING COMMISSION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted April 11, 1978.
Decided May 22, 1978.
*534 Before Judges MATTHEWS, CRANE and ANTELL.
Mr. Michael J. Piarulli, attorney for appellant.
*535 Mr. John J. Degnan, Attorney General of New Jersey, attorney for respondents (Mr. William F. Hyland, former Attorney General; Mr. James F. Mulvihill, Deputy Attorney General, of counsel; Mr. Alan Dexter Bowman, Deputy Attorney General, of counsel and on the brief).
Messrs. Judge, Dowd & Geddis, attorneys for amicus curiae New Jersey Division, Horsemen's Benevolent and Protective Association (Mr. Dennis O. Dowd on the brief).
PER CURIAM.
This is an appeal from a determination of the New Jersey Racing Commission suspending appellant's license as a horse trainer for a period of ten days.
Appellant does not dispute the facts which were found by the Executive Director of the Racing Commission who acted as a hearing officer. He found, pursuant to a stipulation, that after a race the horse Mighty Marval was found by urinalysis to have been administered a drug known as phenylbutazone. He further found that the trainer had no direct knowledge that the horse had been administered medication and that he had made an attempt to protect the horse by hiring a groom to oversee the horse while he was stabled. Nevertheless, the hearing officer concluded that the trainer violated Racing Commission Rules 14:19 and 20:07, N.J.A.C. 13:70-14.19(a) and N.J.A.C. 13:70-20.7, and recommended suspension. The Racing Commission subsequently adopted the hearing officer's findings of fact and his recommendation.
Appellant argues that the hearing officer misinterpreted the regulation; that his finding was arbitrary and capricious; that the rule of strict liability is unreasonable and if applied as interpreted, it would deprive him of a property right without due process of law. Amicus curiae argues that before any trainer may be suspended for a violation of the rules, it must be found that the trainer either directly administered the drug, knew of the drug's administration or *536 was negligent in his care of the horse, thus permitting the horse to have been drugged. It, too, raises a due process argument.
Racing Commission Rule 14:19, found in N.J.A.C. 13:70:14.19(a), declares that it is the obligation of all persons charged with the care of a horse to protect the horse from the administration of drugs. The rule provides as follows:
The owner, trainer, groom or any other person who is charged with the custody, care and responsibility of a horse, are all obligated to protect and guard the horse against the administration, or attempted administration, either internally or externally, of any stimulant, depressant, local anesthetic, analgesic, tranquilizer, anti-inflammatory chemical or drug of any kind or description.
Racing Commission Rule 20:07, N.J.A.C. 13:70-20.7, places the primary responsibility for the condition of the horse on the trainer. The rule declares that "A trainer is responsible for the condition of a horse trained by him."
The language employed indicates that the Commission did indeed intend, by adopting the above rules, to place absolute responsibility upon the trainer in situations in which a horse has been administered a drug. That such was the intention of the Commission becomes even more clear from a reading of a companion rule, N.J.A.C. 13:70-20.11. That rule provides in part that
(a) A trainer shall not enter or start a horse that:

* * * * * * * *
3. Has been given in any manner whatsoever, internally or externally, any stimulant, depressant, local anesthetic, tranquilizer, anti-inflammatory or chemical of any kind or description, prior to the race.
The danger of clandestine and dishonest activity inherent in the business of horse racing has been well recognized. Garifine v. Monmouth Park Jockey Club, 29 N.J. 47, 55 (1959). The business itself and the legalized gambling *537 which accompanies its activities are strongly affected by a public interest. State v. Garden State Racing Ass'n, 136 N.J.L. 173, 175 (E. & A. 1947). Corruption in horse racing activities is regarded as an affront to a publicly sponsored sport with the potential of far reaching consequences. State v. Sipp, 149 N.J. Super. 459, 460 (App. Div. 1977). Strict and close regulation is therefore regarded as highly appropriate. Jersey Downs, Inc. v. Div. of N.J. Racing Comm'n, 102 N.J. Super. 451, 457 (App. Div. 1968).
The Legislature has vested the Commission with broad powers "necessary or proper to enable it to carry out fully and effectually all the provisions and purposes of this act." N.J.S.A. 5:5-22. The Commission has also been granted power to prescribe rules under which horse races shall be conducted, N.J.S.A. 5:5-30, and to license trainers and other persons acting in any capacity with the training of race horses pursuant to such rules and regulations it may adopt. And it has been granted the specific power "to revoke or refuse to issue a license if in the opinion of the Commission the revocation * * * is in the public interest." N.J.S.A. 5:5-33.
Our examination of the rules adopted by the Commission must be done with due regard to the legislative policy expressed in the entire statutory enactment. In re Gastman, 147 N.J. Super. 101 (App. Div. 1977). Throughout the statute, N.J.S.A. 5:5-22 to N.J.S.A. 5:5-92, runs the dominant theme of strict control and regulation to the end that horse racing activities be conducted in a manner deserving of public confidence. In particular, one of the essential purposes of the statute is to prevent persons from tampering with race horses. The strict legislative policy is evidenced by the provisions of N.J.S.A. 5:5-71 in which it is declared that any person in control of a horse who permits it to run in a race with knowledge that it has been tampered with by means of a narcotic drug or stimulant shall be guilty of a misdemeanor. We are thus thoroughly *538 convinced that the regulations under consideration are consonant with the statutory purposes and well within the sphere of delegated authority.
It has long been held that the State may make the doing of an act criminal or penal regardless of a corrupt or criminal purpose. State v. Labato, 7 N.J. 137, 149 (1951); Halsted v. State, 41 N.J.L. 552 (E. & A. 1879).
Regulations imposing strict liability regardless of individual knowledge or fault have been upheld in a variety of situations. In United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), reh'g den. 320 U.S. 815, 64 S.Ct. 367, 88 L.Ed. 492 (1943), it was held that conscious fraud was not a necessary element in a prosecution for shipping misbranded or adulterated articles in interstate commerce in violation of the Federal Food, Drug and Cosmetic Act. In a prosecution for selling adulterated milk it was not necessary to show that the seller had knowledge that the milk was below standard. Vandegrift v. Meihle, 66 N.J.L. 92 (Sup. Ct. 1901). Other examples of strict liability imposed without fault include the discharge of deleterious substances into waterways, State v. Kinsley, 103 N.J. Super. 190 (Cty. Ct. 1968), aff'd 105 N.J. Super. 347 (App. Div. 1969); emitting dark smoke in violation of the New Jersey Air Pollution Control Code, Health Dept. v. Concrete Specialties, Inc., 112 N.J. Super. 407 (App. Div. 1970); statute imposing the cost of cleaning up an oil spill, Lansco, Inc. v. Environmental Protection Dept., 138 N.J. Super. 275 (Ch. Div. 1975), aff'd 145 N.J. Super. 433 (App. Div. 1976), certif. den. 73 N.J. 57 (1977), and a municipal ordinance requiring heat in apartments, State v. Elmwood Terrace, Inc., 85 N.J. Super. 240, 246 (App. Div. 1964). In the field of liquor control, a rule which permits proof of a violation by a licensee to be made by showing that an employee committed the prohibited act even if done without the permission or knowledge of the licensee has been held not to deprive the licensee of due process. *539 Mazza v. Cavicchia, 15 N.J. 498 (1954); 279 Club v. Newark Bd. of Alcoh. Bev. Cont., 73 N.J. Super. 15 (App. Div. 1962). And recently, in Fenwick v. Kay American Jeep, Inc., 72 N.J. 372 (1977), a regulation prohibiting the placing of advertisements for the sale of used motor vehicles without a statement of the odometer reading was upheld. The court further noted that a showing of intent was not required.
Against the background of the cases we have discussed, it clearly appears that the regulations are reasonable because of the nature of the subject matter regulated and that their enforcement does not deprive the licensee of due process. We are not persuaded that the decisions of other courts in other jurisdictions cited to us by appellant and the amicus curiae require a contrary result.
Affirmed.