STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-19-32

JULIE GILES,

      Plaintiff

v.

      ORDER

DEPARTMENT OF AGRICULTURE,
CONSERVATION and FORESTRY,

      Defendant

REC'D CUMB CLERKS OFF
APR 6 '20 PM12:05

Plaintiff Julie Giles appeals from an August 19, 2019 decision by the Commissioner of Agriculture, Conservation, and Forestry that she violated 7 M.R.S. § 96(2) by entering an animal that had been administered a prohibited substance in a pulling competition. As a result, Ms. Giles received a mandatory suspension pursuant to 7 M.R.S. § 96(8) from competing in any Maine pulling competition or livestock exhibition for two years, and her ox "Caesar" received a mandatory suspension from competing in any Maine pulling competition for one year.

Specifically, Ms. Giles had entered Caesar as part of a team of oxen in the unlimited weight category pulling competition at the Fryeburg Fair on October 4, 2018. After the event a blood sample was collected from Caesar, and testing confirmed the presence of Flunixin and Phenylbutazone, which the Commissioner found to be prohibited substances.

**Plaintiff–William Childs, Esq.**
**Defendant–Mark Randlett, AAG**

Applicable Statutes and Regulations

7 M.R.S. § 96(2) provides in pertinent part that "a person may not enter or use in an event an animal that has been administered a prohibited substance." An event is defined to mean a pulling competition or a livestock exhibition. 7 M.R.S. § 81(4).

"Prohibited substance" is defined to include "a stimulant, depressant, tranquilizer or local anesthetic that could affect the conduct, actions, endurance, strength, speed, performance, appearance or disposition of an animal." 7 M.R.S. § 81(11)(A). The Department has issued a regulation that further defines "prohibited substance" as "Any substance, including, but not limited to, a narcotic, stimulant, depressant, tranquilizer, local anesthetic, analgesic, drug or drug metabolite, medication of any type or biological substance, at a level greater than the level found in the normal, untreated animal." 01-001 C.M.R. ch. 226 § 1(10)(A).

The Commissioner is authorized to require that animals be tested for prohibited substances after any event, with the testing to be conducted by a licensed veterinarian, and that testing may include blood testing if the veterinarian deems it necessary. 7 M.R.S. § 96(2), (3). The Department's regulations further provide:

> The owner and/or driver of the animal whose specimen is being taken must observe the specimen as it is being taken, the sample as it is sealed, identification and security of the sample and sign required documents to affirm that the person observed the specimen collection, sealing, identification and security of that sample.

01-001 C.M.R. ch. 226 § 2(3).

7 M.R.S. § 96(6) provides that if a chemical test indicates the presence of a prohibited substance, that shall be prima facie evidence that the prohibited substance was administered to the animal. The statute also contains a provision placing responsibility for the presence of

2

a prohibited substance on the owner and driver "in the absence of substantial evidence to the contrary:"

> In the absence of substantial evidence to the contrary, the owner and driver of an animal are responsible for the condition of the animal, including the presence of a prohibited substance, and are charged with knowledge of all the provisions contained in this section and the rules adopted pursuant to this section.

7 M.R.S. § 96(7).

Standard of Review

On an appeal under Rule 80C the court may overturn an agency's decision if it is (1) in violation of constitutional or statutory provisions, (2) in excess of the agency's statutory authority, (3) made upon unlawful procedure, (4) affected by bias or by errors of law, (5) unsupported by substantial evidence, or (6) arbitrary or capricious or characterized by abuse of discretion. 5 M.R.S. § 11007(4)(C).

In undertaking its review, the court cannot substitute its judgment for that of the agency and must affirm the agency's findings of fact if those findings are supported by substantial evidence in the record even if the record also contains inconsistent evidence or evidence contrary to the agency's decision. This does not involve weighing the merits of evidence. Instead, it involves review of the agency's factual findings to determine if there is competent evidence in the record to support those findings. *AngleZ Behavioral Health Services v. DHHS*, 2020 ME 26 ¶ 12; *Friends of Lincoln Lakes v. Board of Environmental Protection*, 2010 ME 18, ¶ 14, 989 A.2d 1128. The agency's findings can only be vacated if there is no competent evidence to support them. *Id.*

3

<u>Discussion</u>

Ms. Giles raises two challenges to the Commissioner's decision. First, she contends that she offered – and the Commissioner ignored – "substantial evidence to the contrary" to rebut the strict liability that section 92(7) would otherwise impose on the owner of an animal in stating that the owner is "responsible for the condition of the animal, including the presence of a prohibited substance." Second, she argues that the Department violated its own rules because neither she, as the owner, nor the driver were present when Caesar was tested as required by 01-001 C.M.R. ch. 226 § 2(3).

### 1. Whether there was "Substantial Evidence to the Contrary"

The Commissioner's August 19, 2019 decision found that Ms. Giles had entered Caesar in a pulling competition at Fryeburg Fair, that a blood sample had been collected from Caesar after the event, that testing confirmed the presence of substances that are not present at any level in untreated oxen, that those substances could affect the endurance, strength and/or performance of an animal in a pulling competition, and that those substances therefore constituted "prohibited substances."

The Commissioner's decision further noted that § 96(7) makes the owner responsible for the presence of a prohibited substance and concluded that there was no substantial evidence to the contrary in the record.

Ms. Giles argues that this was an error of law and an abuse of discretion because (1) the attorney representing the Department at the hearing stated that the Department was not going to present a case that Ms. Giles had drugged her animal or "did anything wrong;" (2) Ms. Giles offered evidence of her honesty and integrity and participation in efforts to

4

safeguard animals; (3) Ms. Giles had no prior violations of Department rules; (4) Ms. Giles offered evidence that she had done what she could to protect her animals at the fair; (5) the amount of prohibited substances found in Caesar's blood sample were smaller than reportable for equine testing.

The Commissioner was entitled to conclude that none of the points raised by Ms. Giles constituted "substantial evidence to the contrary." This follows from the wording of section 96(7), which in the absence of contrary evidence makes an owner responsible for the presence of a prohibited substance regardless of whether the owner intentionally administered the substance, negligently administered the substance, was negligent in allowing someone else to administer the substance, was negligent in not preventing the animal from somehow ingesting the substance, or was not negligent but the animal somehow ingested the substance anyway.

Statutes or regulations of this kind, which impose a form of strict liability, are sometimes referred to as "absolute insurer" provisions. Usually imposed in the context of horse or harness racing, they have been upheld against constitutional challenge even in cases where they do not include an escape clause – such as "the absence of substantial evidence to the contrary." *See, e.g., Hudson v. Texas Racing Commission*, 455 F.3d 597, 600-01 (5th Cir. 2006); *Goldman v. Maryland Racing Commission*, 584 A.2d 709, 712-13 (Md. App. 1991); *Division of Pari-Mutual Wagering v. Caple*, 362 So.2d 1350, 1354-56 (Fla. 1978); *Sandstrom v. California Horse Racing Board*, 189 P.2d 17, 19-21, 23 (Cal. 1948); *Watts v. Maine Harness Racing Commission*, 1997 Me. Super. LEXIS 27 *3-*4 (Superior Ct. Cumberland County, January 27, 1997) (Saufley, J.). [1]

---

[1] Giles has not raised any constitutional challenge in this case.

5

An absolute insurer rule, as stated by the Fifth Circuit in *Hudson v. Texas Racing Commission,*

> makes the trainer of a horse that is entered in a race the absolute insurer that the horse is free from all prohibited substances. No presumption of trainer fault is created when the presence of a prohibited substance is found. The absolute insurer rule does not assign fault, but instead, requires the trainer to bear the responsibility of the horse's condition . . .

455 F.3d at 600. The logic behind the rule is that a trainer (in the case of a racehorse) or owner (in the case of oxen entered in pulling competitions) has day-to-day charge of the animal, its feeding, its medications, and all the other circumstances that bear on the animal's condition. The owner has access to all the relevant information. If the Department had to demonstrate that the owner had personally caused the administration of the prohibited substance or had been personally negligent in allowing a prohibited substance to be administered, it would be difficult if not impossible for it to enforce the prohibited substance rule.

7 M.R.S. § 96(7) does not impose strict liability because it allows for the possibility that there will be "substantial evidence to the contrary." Because the statute otherwise makes the owner responsible regardless of any showing of fault, however, this means that in most cases "substantial evidence to the contrary" must directly relate to the question of responsibility – in other words, evidence that someone else or something else, outside of the owner's knowledge or control, was responsible for the presence of the prohibited substance.

The Commissioner was entitled to find that there was no substantial evidence to the contrary in this case. The Department's lawyer stated at the hearing that "[t[he State is not going to make a case – we're not going to make a case that Julie Giles did anything wrong,

6

that she's not – doesn't have integrity, that she's – was trying to cheat, that she was drugging. . . . But the law is what the law is." R. Tab 2, Tr. 17.[2] This may not have been felicitously phrased, but it was accurate. The Department did not make out a case that Ms. Giles had engaged in any intentional wrongdoing or that she had been negligent, but it did not need to make such a case under the statute.

It is the responsibility of the Commissioner, not the court, to weigh the evidence, the Commissioner was entitled to find that Ms. Giles's evidence that she had a very good reputation for honesty, that she had no prior violations, and that she participated in efforts to safeguard animals did not affect her statutory responsibility for her animal's condition at the Fryeburg Fair on October 4, 2018. The same is true for Ms. Giles's testimony that she did what she could to protect her animals even though, at an event like the Fryeburg Fair, she cannot ensure that others do not have access to her animals. See R. Tab 2 Tr. 49-51.[3] Finally, the fact that the amount of prohibited substances found was smaller than the amount reportable for equine animals also does not affect the result in this case. The applicable standard for an animal in a pulling competition is the presence of any prohibited substance "at a level greater than the level found in the normal, untreated animal." 01-001 C.M.R. ch. 226 § 1(10)(A). There was uncontroverted evidence in this case that Flunixin and Phenylbutazone are not found in normal, untreated oxen.

---

[2] Subsequently, in questioning Ms. Giles, the Department's attorney stated, "[Y]ou understand that the State has not argued that you drugged your animal, right? So I want to be clear about that. *But that you are responsible for the condition of your animal.*" R. Tab 2, Tr. 49 (emphasis added).

[3] As noted above, unless there is evidence showing that someone else or something else was responsible for the presence of the prohibited substance, the statute makes the owner responsible even if the owner was not negligent but the animal somehow ingested the substance anyway – which may have been the situation in this case.

Accordingly, on this record the Commissioner did not commit an error of law or an abuse of discretion in determining that there was no substantial evidence that countered the statutory responsibility of Ms. Giles for the condition of her animal in this case.

## Absence of Giles When the Test Was Performed

The other major argument presented by Ms. Giles is that, despite the requirement in 01-001 C.M.R. ch. 226 § 2(3) that the owner or driver observe the taking of the test specimen and the sealing, identification, and security of the sample, neither she nor the driver were present.

The evidence at the hearing established that before the pulling competition began, Ms. Giles left Caesar and the other ox in her team in care of Bill Ford, whom she described as a friend, because she simultaneously had other animals in a show event elsewhere on the fairgrounds. R. Tab 2, Tr. 55-57, 60, 261-63. Before she left, she learned that the person she expected to drive the team in the pulling competition was not going to be able to do so.[4] As she left, she was still looking for a substitute. Tr. 55-57. When Ford notified her by cellphone that another potential replacement was unavailable, she called Dan Jordan on her cell phone and asked him to drive as a last-minute substitute. Tr. 57, 263.

Ms. Giles testified that she was never informed that an ox from her team would be tested, but there was contrary testimony – on which the Commissioner relied – that before the event began she was notified that her oxen would be tested after the competition.[5] After

---

[4] She testified that she learned he would not be available because he was taking animals from a prior event to have their blood tested. Tr. 54-56.

[5] Ms. Giles argues with some force that the witness who initially testified that she notified Ms. Giles subsequently backtracked and said she did not remember whether she had notified Ms. Giles or the

8

the pulling competition ended, Dan Jordan's involvement ceased. Tr. 104.[6] Ms. Giles remained at the other event, and Bill Ford was still taking care of Caesar and the other ox on his team. Tr. 263. Ford subsequently accompanied Caesar over to the testing location, and Ford then witnessed the testing and the sealing of the test sample. Tr. 220.

01-001 C.M.R. ch. 226 § 2(3) provides that the owner or driver shall sign documentation confirming observation of the test. In this case there is a document listing the test sample number, Caesar's name and ear tag, the signature of the veterinarian who took the sample, and a line where Bill Ford signed as witness. Department's Ex. 3 (R. Tab. 5).

Because chapter 226 § 2(3) states that the owner or driver "must observe" the testing and sealing of the sample, Ms. Giles argues that the Department violated its own regulations in basing its decision on a test that she did not observe. The Commissioner addressed this issue in a footnote in the decision. First, the Commissioner concluded that Ms. Giles had delegated her responsibility for Caesar to Mr. Ford, and that Ford had witnessed the test on her behalf. August 19, 2019 Decision n.2. The Commissioner's decision states that this constituted "substantial compliance" with the regulation. Second, the Commissioner argues that even if the regulation was violated, the Department is still entitled to sanction Ms. Giles pursuant to 7 M.R.S. §§ 96(2) and 96(7) based on the presence of prohibited substances. *Id.*

The court concludes that the regulation does not strictly require the personal presence of an owner or driver to observe the testing; compliance may be achieved with the

---

helper who signed the oxen in for the event. *See* Tr. 252-53. However, it is the Commissioner's role, not that of the court, to weigh the evidence. Moreover, Ms. Giles's own testimony demonstrated that she knew oxen from other events were being tested. Tr. 55-56. There was also evidence that, although testing does not occur at every fair, when testing does occur, one ox from every team gets tested. R. Tab 2, Tr. 171-74.

[6] It is undisputed that Jordan did not observe the test.

presence of an owner's or driver's agent. Otherwise testing procedures could be unreasonably delayed whenever an owner was occupied in another event, as Ms. Giles was in this case.

With some reluctance, the court also concludes that where the Commissioner found that Ms. Giles had been notified that oxen would be tested after the event, where Ms. Giles had left Caesar in the care of Bill Ford when she left before the pulling competition began, where Caesar remained in Mr. Ford's care after the competition, where Mr. Ford brought Caesar to be tested, and where after observing the testing Mr. Ford signed as a witness, the Commissioner was entitled to draw the inference that Ms. Giles had delegated responsibility to Mr. Ford as her agent for purposes of ch. 226 § 2(3). Even if the court might have reached a different result, it is obliged to defer to the agency's finding if there is evidence on which the agency could make that finding.

Accordingly, it will affirm the Commissioner's decision and the suspensions of Ms. Giles and her animal.

However, the court emphatically does not agree with the Department's alternative position – that the agency can disregard a violation of chapter 226 § 2(3) on the theory that requiring compliance with the regulation would conflict with its ability to enforce the prohibited substance statute. See August 19, 2019 Decision n.2 (stating that noncompliance with the regulation "would not exculpate Ms. Giles – the rule should not be read to conflict with the statute by preventing the Department from enforcing its mandatory provisions").

When an agency regulation is inconsistent with the governing statute, the statute controls. *Dubois v. Department of Agriculture*, 2018 ME 68 ¶ 21 n.9, 185 A.3d 743. However, there is no inconsistency between 7 M.R.S. §§ 96(2) and 96(7) and a regulation designed to

10

allow owners to observe that a test specimen was properly taken, properly identified, and properly secured. While agencies have some leniency in interpreting certain regulations, the court is not aware of any authority for the proposition that this principle applies to procedural rules designed to protect persons who may be subjected to administrative sanctions. The regulation in this case – with wording chosen by the Department – says that the owner or driver "must observe" the testing. Absent observation of the testing by the owner or driver or a person found to have been their agent, the Department is not entitled to rely on the results of a test.

The entry shall be:

The August 19, 2019 decision of the Commissioner suspending Julie Giles for two years and her ox Caesar for one year for violation of 7 M.R.S. §§ 96(2) and 96(7) is affirmed. The clerk shall incorporate this order in the docket by reference.

Dated: April __8__, 2020

Thomas D. Warren
Justice, Superior Court

Entered on the Docket: 04/27/20

11